UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JERRY D. VENT,                    )
                                  )
          Plaintiff,              )
                                  )
     v.                           )    Case No. 4:11CV1960 FRB
                                  )
CAROLYN W. COLVIN,[1] Commissioner )
of Social Security,               )
                                  )
          Defendant.              )


<u>**MEMORANDUM AND ORDER**</u>

This matter is before the Court on plaintiff Jerry D.
Vent's appeal of an adverse decision of the Social Security
Administration.  All matters are pending before the undersigned
United States Magistrate Judge, with consent of the parties,
pursuant to 28 U.S.C. § 636(c).

## I.    Background and Procedural History

Plaintiff Jerry D. Vent applied for Disability Insurance
Benefits ("DIB") pursuant to Title II, and Supplemental Security
Income ("SSI") pursuant to Title XVI of the Social Security Act, 42
U.S.C. §§ 401, <u>et</u> <u>seq.</u> (also "Act"), alleging that he became
disabled on February 28, 2006.  Plaintiff's applications were
denied, and he requested a hearing before an administrative law

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social
Security on February 14, 2013.  Pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure, Carolyn W. Colvin should
therefore be substituted for Michael J. Astrue as the defendant
in this case.  No further action needs to be taken to continue
this suit by reason of the last sentence of 42 U.S.C. § 405(g).

- 1 -

judge ("ALJ"), which was held on January 26, 2011. (Tr. 345-81). On February 7, 2011, the ALJ issued an unfavorable decision. (Tr. 10-21). Plaintiff then sought review from defendant Agency's Appeals Council, which denied plaintiff's request for review on October 13, 2011. (Tr. 5-9). The ALJ's decision thus stands as the Commissioner's final decision subject to review in this Court. 42 U.S.C. § 405(g).

## II.  Evidence Before The ALJ

A.  <u>Plaintiff's Testimony</u>

Plaintiff responded to questions posed by the ALJ. He testified that he was 51 years old, five feet ten inches tall, 215 pounds, and right handed. (Tr. 349). His last educational level was the tenth grade, and he did not earn a G.E.D. or receive vocational or job training. (Tr. 352). He is able to read and write. (<u>Id.</u>) He does not smoke or drink, never had a drinking problem, and has no history of drug use. (Tr. 359).

Plaintiff testified that he was married and lived in a single-wide trailer with his wife and 11-year-old grandson. (Tr. 349-50). He testified that he had a driver's license but not been driving because his vehicle was not operable, and that his father had driven him to the administrative hearing. (Tr. 350). Plaintiff testified that the family's source of income was his wife's disability check and food stamps, and that he had medical insurance through Medicaid. (Tr. 350-51).

Plaintiff testified that he last worked in 2005 as a handyman for Absolute Outsourcing, but only worked one day because

the office was too far away. (Tr. 352). Plaintiff testified that the majority of the work he had performed in the past 15 years was as a maintenance man and handyman, work that required lifting 50 to 100 pounds. (Tr. 353-54). Plaintiff testified that he had not sought or attempted to work since leaving his last job in 2005. (Tr. 353-54). He testified that his wife had thyroid cancer and was sometimes hospitalized. (Tr. 354). Plaintiff and the ALJ had the following exchange:

> *Question (by the ALJ)*: Okay. Why did you stop working? What happened?
>
> *Answer (by plaintiff)*: Well, my wife, she's been in and out of the hospital pretty much so I couldn't keep a steady job, you know, with her problems.
>
> *Q.* Okay. So you stopped so you could take care of her?
>
> *A.* Yeah, and my grandson too.
>
> *Q.* Do you have anyone else in the family to do that?
>
> *A.* No.
>
> (Tr. 355).

Plaintiff testified that he rose in the morning at six. (Id.) When asked what he did in the morning, plaintiff replied "I sit and watch TV mainly." (Id.) He testified that he did not eat breakfast, but that his wife sometimes cooked and his daughter sometimes visited and cooked. (Id.) Plaintiff testified that he did not do laundry, dishes, make his bed, change his sheets, vacuum, mop, or sweep, and spent his days watching television, napping, reading, and handing the family finances. (Tr. 356-57).

When the ALJ noted that plaintiff indicated in his Function Report that he performed several other daily activities, plaintiff testified that his "health started getting pretty bad" since then. (Tr. 357). Plaintiff denied that he drove, went to the post office, took out the trash, fished, played ball with his grandson, or did yard work. (Tr. 357-59). He stated that he did not have friends but did get along with his wife, family, and neighbors. (Tr. 358). He stated that he did not belong to clubs or organizations, and stopped going to church when his vehicle stopped running. (Tr. 358-59). Plaintiff testified that, during the summertime, he sometimes sat outside or went to a barbeque. (Tr. 359).

Regarding self-care, plaintiff testified that he had difficulty washing his back, and that his shoulder was going bad. (Id.) Plaintiff testified that he is diabetic and is treated successfully with medication and injections, but has the following difficulties: sweats, feeling like he is going to faint, sores on his legs, vision problems, and numbness in his legs and arms while sleeping that sometimes persisted after getting out of bed. (Tr. 360-61). He testified that he had hypertension. (Tr. 361). Plaintiff testified that he took various medications, including Ibuprofen, Naproxen, Tylenol with hydrocodone, medicines for joint pain, and a muscle relaxer. (Tr. 362-63). Plaintiff stated that one of his medications caused him to feel light headed, but he did not know which one. (Tr. 363-64).

Plaintiff testified that, "back in the '80s" he had three

slipped discs in his back, and had suffered from pain ever since. (Tr. 364). He testified that, when he first woke in the morning, he could hardly walk, and had to "move around a little bit to get [his] back adjusted." (Id.) The ALJ asked plaintiff to quantify the pain he normally experienced using a one-to-ten scale, with ten representing the worst pain, and plaintiff replied "[a]lmost sometimes ten." (Id.) Plaintiff had never undergone back surgery and had not had radiological testing of his back since the 1980s, but was scheduled for an orthopedic visit and a back x-ray the following week. (Tr. 364-65, 370). When asked why he had waited so long to have radiological testing, plaintiff replied that his medical treatment providers were focusing more on diabetes than his back pain. (Tr. 365).

Plaintiff testified that he dislocated his left shoulder two years ago in a fall from his roof. (Id.) He stated that he did not see the x-rays that were performed and does not know what his doctors said about his shoulder. (Id.) He testified that he could not raise his left arm over his shoulder, and could not reach out in front of his body without pain. (Tr. 365-66). He testified that his shoulder hurt every day, and that he felt popping, cracking and grinding. (Tr. 365). He quantified the pain as an 8 on a one-to-ten scale. (Id.)

Plaintiff testified that sitting caused back problems. (Tr. 368). He stated that he could stand for 20 to 30 minutes, walk one block, and lift ten pounds. (Id.) Bending, stooping, crouching, kneeling and crawling caused back pain, and he had

trouble traveling stairs unless he used a cane. (Tr. 368-69).

Plaintiff testified that he had lumps on his head and back, but that they had never been checked and he did not know what they were. (Tr. 366). He stated that his vision was deteriorating. (Id.) He testified that he suffered from depression, anxiety, and occasional moodiness, and that he cried often and had felt suicidal, but had made no attempts on his life. (Tr. 366-67). He had never seen a mental health professional but had thought about doing so. (Tr. 367). Plaintiff testified that he had occasional problems with concentration. (Tr. 367-68).

Plaintiff also responded to questions posed by his attorney. He testified that he suffered from intermittent but daily numbness in his legs that was worse on the left side. (Tr. 370). Plaintiff also stated "[e]very night when I go to sleep my legs go numb." (Id.) Plaintiff and his attorney then had the following exchange:

> *Question (by counsel):* Is it just when you go to sleep or can it be when you're sitting up and walking around?
>
> *Answer (by plaintiff):* When I'm sitting up. Mainly when I go to sleep at night my hands and my leg goes numb.
>
> Q. Okay. All right. So if you're sitting up during the day it does not go numb, is that what you're saying?
>
> A. It goes numb too - -
>
> Q. Okay.

A.          - - but not as much as when I'm sleeping at
night.

(Tr. 371).

      Plaintiff testified that the numbness kept him awake and
that he tossed and turned all night. (Id.) He testified that
numbness also caused problems with sitting, and that he had to get
up and walk for five to ten minutes "[o]nce an hour at least.
Every 30 minutes. I mean, I have to constantly move to get, you
know, the feeling back." (Tr. 371-72). Plaintiff testified that
he experienced numbness if he stood for longer than 30 minutes, and
needed a cane to balance when walking. (Tr. 372-73). He testified
that he would be able to type for five minutes, and that he had
trouble with grasping and holding things like cups and plates.
(Tr. 374). He stated that he had trouble picking up small items
such as coins due to numbness in his fingers. (Id.) He testified
that he tried to nap for 30 minutes each day in an attempt to
alleviate pain. (Tr. 376).

      The ALJ then heard testimony from a Vocational Expert
("VE"). After classifying plaintiff's past work and considering
hypothetical questions posed by the ALJ, the VE testified regarding
various jobs the hypothetical individual could perform, including
host, furniture rental consultant, and usher.

      B. Medical Records

      On January 17, 2008, plaintiff saw Barry Burchett, M.D.,
for an internal medicine examination at the request of Missouri
Disability Determination. (Tr. 233). Dr. Burchett noted that

- 7 -

plaintiff was "claiming disability stating 'mainly my back.'" (Id.)
Plaintiff stated that he had done a lot of heavy lifting when he
was younger and began having trouble with his back, and saw a
physician who performed x-rays. (Id.) Plaintiff stated that, for
the past ten years, he had experienced constant pain in his back
near the midline at approximately L5 to S1. (Id.) Plaintiff did
not describe radicular pain or associated numbness or tingling in
the lower extremities. (Tr. 233). Upon examination, Dr. Burchett
noted that plaintiff ambulated with a normal gait, did not require
the use of an assistive device, and appeared stable and comfortable
in the supine and sitting positions. (Tr. 234). Plaintiff's
appearance, mood, orientation and thinking were appropriate, and
his recent and remote memory was good. (Id.) Examination of
plaintiff's shoulders, elbows, wrists, hands, and legs was normal.
(Tr. 235). Regarding plaintiff's hands, Dr. Burchett observed that
plaintiff was able to pick up coins without difficulty. (Id.)
Examination of plaintiff's back revealed no spasm or tenderness.
(Id.) Straight leg raise testing was positive at 70 degrees on the
left and 90 degrees on the right. (Id.) Plaintiff was able to
heel and toe walk. (Tr. 236). He could perform a full squat, but
experienced pain when doing so. (Id.) Deep tendon reflexes were
symmetrical, and there were no motor or sensory abnormalities in
the lower extremities. (Id.) Dr. Burchett's impression was
chronic low back pain probable degenerative disc disease without
radiculopathy, and untreated hypertension. (Id.) Dr. Burchett
noted that plaintiff had a long history of low back pain without

treatment.  (Tr. 236).

On February 20, 2008, Marsha Toll, Psy.D., completed a Psychiatric Review Technique form.  (Tr. 239).  Dr. Toll opined that plaintiff had no medically determinable impairment.  (Id.) Dr. Toll observed that plaintiff had no history of treatment and took no psychiatric medication, and that, during physical examination, plaintiff was noted to have a normal appearance, mood, orientation, and thinking, and good recent and remote memory.  (Tr. 249).

Records from Parkland Health Center indicate that plaintiff was seen on September 8, 2009 by Akeeb Adedokun, M.D. (Tr. 250-60).  Plaintiff reported that he fell from a roof three weeks ago and caught himself on beams, and had since experienced constant bilateral shoulder pain accompanied by an audible "clicking" sound.  (Tr. 252).  Shoulder radiography revealed a normal left shoulder, and degenerative disease of the right shoulder.  (Tr. 259).  Plaintiff was diagnosed with hypertension and shoulder sprain, and given prescriptions for Tylenol #3,[2] Flexeril,[3] and Metoprolol,[4] and advised to follow up with his doctor for hypertension.  (Tr. 251, 258).

---

[2]Tylenol 3 is used to relieve mild to moderate pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681004.html

[3]Flexeril, or Cyclobenzaprine, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries.  http://www.nlm.nih.gov/ medlineplus/druginfo/medmaster/a682514.html

[4]Metoprolol is used to treat hypertension. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/ a682864.html

Records from Fernando DeCastro, M.D., indicate that plaintiff was seen on November 5, 2009 for a medical evaluation to determine eligibility for Missouri state aid. (Tr. 262-66). It was noted that plaintiff was taking Metoprolol, but no other medications were noted. (Tr. 262). Although Dr. DeCastro's "History and Physical" form contained a space for him to record his findings upon examination, Dr. DeCastro left this space blank. (Tr. 262). In a later page of the report, Dr. DeCastro checked boxes indicating that plaintiff had no edema, skin discoloration, or shortness of breath. (Tr. 265). Dr. DeCastro diagnosed plaintiff with hypertension, rotator cuff injury, anxiety and depression, and checked a box indicating that plaintiff would be disabled/incapacitated for three to five months. (Tr. 266).

Records from Medex indicate that plaintiff was examined by Stanley London, M.D., on February 4, 2010. (Tr. 267-71). Dr. London noted that plaintiff's chief complaints related primarily to his left shoulder, but also to his neck. (Tr. 267). Dr. London noted that there was no real radicular pain in plaintiff's left arm, but that plaintiff complained of numbness and tingling. (Id.) Plaintiff reported that, when he initially sought treatment after the fall, the doctors did not do much for him, and were more concerned about his blood pressure. (Id.) Plaintiff described his pain as sharp and aching in his neck and shoulder, stated that he took Tylenol for relief, and denied that he had radicular pain from his neck. (Id.) Plaintiff reported that any activity exacerbated his pain, and that he could not walk far, or stand or sit for long.

(Tr. 267). Upon examination, plaintiff had markedly restricted range of motion of his left shoulder and neck. (Tr. 268). Dr. London wrote that plaintiff "keeps telling me there is numbness in his left arm and left fingers, but when I ask him to compare the two sides, he says they are equal." (Id.) Sensation in plaintiff's fingers was equal, straight leg raise testing was normal, and his reflexes were normal. (Id.) X-ray of the cervical spine revealed degenerative joint disease, and disc space narrowing at C5-C7. (Tr. 269). Dr. London opined that plaintiff had a rotator cuff tear of his left shoulder, degenerative joint disease, and possible degenerative disc disease of his neck. (Tr. 268).

On March 29, 2010, James Spence, Ph.D., completed a Psychiatric Review Technique form. (Tr. 272-82). Dr. Spence opined that plaintiff had no medically determinable impairment. (Id.) Dr. Spence noted that plaintiff received no ongoing medical or psychological treatment, there was no evidence of prior inpatient or outpatient psychiatric treatment, and plaintiff took no psychiatric medication. (Tr. 282). Dr. Spence also noted that, when plaintiff was seen by Dr. London for an examination to determine eligibility for state aid, he reported no psychiatric complaints. (Id.)

On April 8, 2010, Christy Huff completed a Physical Residual Functional Capacity Assessment form. (Tr. 283-89). Ms. Huff reviewed plaintiff's medical records and noted that there was no evidence to support a medically determinable impairment other

than a left shoulder sprain. (Tr. 285). Ms. Huff opined that plaintiff could occasionally lift 50 pounds and frequently lift 25, stand, walk and/or sit for six hours in an eight-hour work day, and push and/or pull without limitation. (Tr. 284). She opined that plaintiff should only occasionally climb a ladder, rope or scaffold, but could frequently perform all other postural maneuvers. (Tr. 285). Ms. Huff opined that plaintiff was limited in his ability to reach in all directions, but had no other manipulative limitations. (Tr. 286).

On August 16, 2010, plaintiff was seen at Bonne Terre Medical Associates, stating that he was there for a check up and medication refills. (Tr. 296). He also stated that he was depressed, and that he was having pain in the middle of his back. (Id.) Plaintiff's past medical history was noted as blurred vision, elevated blood pressure, heartburn and indigestion. (Id.) It is noted that plaintiff had not been taking his medications and that he had financial problems, car problems, and stress. (Id.) Upon examination, plaintiff's neck was normal and supple. (Tr. 296). His affect and mood were appropriate. (Id.) He was diagnosed with hypertension and diabetes. (Id.) Plaintiff returned on August 20, 2010 for follow-up and lab results; it does not appear that examination was performed. (Tr. 297).

On October 22, 2010, plaintiff returned to Bonne Terre Medical Associates with complaints of swelling in his left knee since the previous weekend, stating that he had no injury he "just walked a lot." (Tr. 298). Plaintiff also complained of right

- 12 -

thumb pain and a toothache. (Id.) Examination, including neck, neurological, and musculoskeletal system examination, was normal. (Id.) The assessment was diabetes, right hand pain, and left knee pain, and x-rays were ordered. (Id.) October 24, 2010, x-ray of plaintiff's left knee revealed no evidence of abnormality. (Tr. 301). Right hand x-ray performed on that same date revealed a deformity of the fifth metacarpal that appeared to be an old, healed fracture, but no other abnormal findings. (Tr. 302).

### III.    The ALJ's Decision

The ALJ determined that plaintiff had "degenerative joint disease at C5-C6 and C6-C7; status-post left shoulder sprain; hypertension; diabetes mellitus and hyperlipidemia controlled by medication; and complaints of back pain, peripheral neuropathy, vision loss, and depression without real medical foundation." (Tr. 20). The ALJ determined that plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (Id.) The ALJ determined that plaintiff was unable to perform his past relevant work, but retained the residual functional capacity ("RFC") to perform the full range of at least light work except for "lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally; climbing of ropes, ladders or scaffolds, kneeling or crawling; doing more than occasional climbing of ramps and stairs or more than occasional balancing, stooping, or crouching; using the nondominant left upper extremity for no more than occasional reaching in all directions; or having concentrated or excessive exposure to unprotected

- 13 -

heights." (Id.)  The ALJ noted that, when the vocational expert was asked to assume such capabilities and limitations, he testified that such a person could perform any of a total of 8,000 light jobs in the state of Missouri and 377,000 nationwide as a host, furniture rental agent, and usher. (Tr. 17).  Using the medical-vocational guidelines as a framework, and the vocational expert's opinions, the ALJ determined that plaintiff was not disabled. (Tr. 19).  The ALJ noted that the vocational expert's opinions provide specific jobs in significant numbers that were consistent with plaintiff's medically-established capabilities and limitations. (Id.)

## IV.    Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act (also "Act"), plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether the claimant's impairment(s) meet or equal any listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to a listed impairment, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);

<u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001). The "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Coleman</u>, 498 F.3d at 770; <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999).

If substantial evidence exists to support the administrative decision, this Court must affirm that decision even if the record also supports an opposite decision. <u>Weikert v. Sullivan</u>, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); <u>see also</u> <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003); <u>see also</u> <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000) (In the event that two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole).

In the case at bar, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. In support, plaintiff argues that the ALJ's RFC determination is legally insufficient, that the ALJ improperly considered certain evidence in assessing credibility, and, because

the hypothetical question posed to the VE was based upon a flawed RFC, it was insufficient. Plaintiff also contends that the ALJ failed to properly consider certain medical evidence. In response, the Commissioner contends that substantial evidence supports the ALJ's decision.

A.  Credibility Determination

The ALJ discredited plaintiff's allegations of symptoms precluding all work. Plaintiff alleges error, arguing that the ALJ improperly considered his work history and the absence of medical evidence to support his complaints. Review of the decision reveals no error.

Before determining a claimant's residual functional capacity, the ALJ must evaluate the credibility of his subjective complaints. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217). Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of his alleged physical impairment. Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984). In Polaski, the Eighth Circuit addressed this difficulty and established the following standard for the evaluation of subjective complaints:

The absence of an objective medical basis

which supports the degree of severity of
subjective complaints alleged is just one
factor to be considered in evaluating the
credibility of the testimony and complaints.
The adjudicator must give full consideration
to all of the evidence presented relating to
subjective complaints, including the
claimant's prior work record, and observations
by third parties and treating and examining
physicians relating to such matters as: (1)
the claimant's daily activities; (2) the
duration, frequency and intensity of the pain;
(3) precipitating and aggravating factors; (4)
dosage, effectiveness and side effects of
medication; (5) functional restrictions.

Id. at 1322.

Although the ALJ is not free to accept or reject the
claimant's subjective complaints based upon personal observations
alone, he may discount such complaints if there are inconsistencies
in the evidence as a whole.  Id.  The "crucial question" is not
whether the claimant experiences symptoms, but whether his credible
subjective complaints prevent him from working.  Gregg v. Barnhart,
354 F.3d 710, 713-14 (8th Cir. 2003).  When an ALJ explicitly
considers the Polaski factors and discredits a claimant's
complaints for a good reason, that decision should be upheld.
Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).  The credibility
of a claimant's subjective testimony is primarily for the ALJ, not
the courts, to decide, and the court considers with deference the
ALJ's decision on the subject.  Tellez v. Barnhart, 403 F.3d 953,
957 (8th Cir. 2005).

In his written decision, the ALJ acknowledged his duty to
consider the issue of plaintiff's credibility using the foregoing

<u>Polaski</u> factors, listed the factors, and cited 20 C.F.R. §§ 404.1529 and 416.929, the Regulations corresponding with <u>Polaski</u> and credibility determination. The ALJ wrote that plaintiff "had a scattered and somewhat erratic work record, with fair earnings in some years but little or no earnings in others." (Tr. 15). This finding is supported by the record. Review of plaintiff's work record shows that his first year of recorded earnings was 1977, when he earned $111.25. (Tr. 144). He worked sporadically after that, with markedly low earnings in 1981 and 1984 and no earnings in 1978, 1979, 1980, 1982, 1983, and 1985. (<u>Id.</u>) Plaintiff had recorded earnings for each year from 1986 through 2000, but those earnings fluctuated dramatically; for example, he earned $7,735.07 in 1987 but $641.20 in 1989 and $207.00 in 1990. (<u>Id.</u>) He earned $9,987.50 in 1999, but earned nearly half that amount the following year, nothing in 2001, and $77.50 in 2002. (<u>Id.</u>) This is not a case in which the earnings record reflects that the claimant worked consistently but held low-paying jobs. This is a case in which the claimant's earnings record suggests low motivation to work. The ALJ's characterization of plaintiff's work history was accurate, and it was proper for him to consider plaintiff's work history as one factor detracting from his credibility. <u>See</u> <u>Comstock v. Chater</u>, 91 F.3d 1143, 1147 (8th Cir. 1996) (a work record characterized by low earnings and significant breaks in employment detracts from a claimant's credibility); <u>see also</u> <u>Hutton v. Apfel</u>, 175 F.3d 651, 655 (8th Cir. 1999) (citing <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1214 (8th Cir. 1993) (a poor work history lessens a

claimant's credibility).

The ALJ did not consider plaintiff's work history dispositive of the issue of his credibility. Instead, the ALJ wrote: "the work record is only one factor to be considered when assessing credibility." (Tr. 15). The ALJ then continued his assessment of plaintiff's credibility, noting several inconsistencies in the record that detracted therefrom, including the lack of correlation between plaintiff's testimony and the medical evidence of record. Plaintiff states that the ALJ erroneously considered the medical evidence in assessing credibility, and merely recited the evidence and concluded that some signs were normal. (Docket No. 16 at 12). This does not accurately reflect the ALJ's decision. The ALJ's decision contains a comprehensive and thoughtful analysis of the medical evidence of record. In addition, plaintiff appears to ignore the fact that the ALJ was required to consider the extent to which plaintiff's subjective allegations could reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §§ 404.1529, 416.929.

The ALJ observed that, while plaintiff had been diagnosed with diabetes mellitus and prescribed medication for it, there was no finding of retinopathy, and no objective testing indicated neuropathy. The ALJ noted that, despite radiological findings of degenerative joint disease in the cervical spine at C5-C6 and C6-C7, plaintiff did not testify that he suffered from neck pain. The ALJ noted that, despite plaintiff's allegations of debilitating

hand symptoms, examination revealed normal bilateral grip strength and digital dexterity for gross and fine movements except for 3/5 strength of the left hand. The ALJ further noted that a knee x-ray in October of 2010 was negative, and an x-ray of plaintiff's right hand showed only a possible old, healed fracture. The ALJ noted that plaintiff had been diagnosed with a shoulder sprain. Indeed, following a fall from a roof, plaintiff underwent shoulder radiographs which revealed normal findings on the left and degenerative disease on the right, and plaintiff was diagnosed with shoulder sprain. The ALJ's determination that the medical evidence failed to support plaintiff's allegations was proper. While the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ is entitled to consider the fact that there is no objective medical evidence to support the degree of alleged limitations. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); Kisling v. Chater, 105 F.3d 1255, 1257-58 (8th Cir. 1997); Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989) (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered).

In further assessment of plaintiff's credibility, the ALJ noted that plaintiff received only sporadic and conservative treatment, despite the fact that he was covered by Medicaid. This finding is supported by the record. While plaintiff alleged that his condition was disabling beginning in February of 2006, there are no medical records indicating treatment at that time. The earliest medical evidence, dated in 2008, is a consultative

examination performed for the purpose of determining disability. Plaintiff did not seek medical treatment until September of 2009, following a fall from a roof. He then went from September 2009 to August 2010 without any medical care. From then until November of 2010, he was seen in an outpatient clinic with complaints that were not consistent with those he described during the administrative hearing. His last medical care of record was dated three months before the administrative hearing. He was never advised to have surgery for any condition, or even to seek evaluation by a specialist. Claims of disabling pain may be discredited when the record reflects minimal or conservative medical treatment. Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994) (minimal treatment of back pain and migraine headaches was inconsistent with claims of disabling pain); Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004) (citing Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987) ("Infrequent treatment is also a basis for discounting a claimant's subjective complaints"). In addition, while plaintiff testified regarding debilitating shoulder, hand, and leg symptoms that drastically reduced his ability to walk, sit, grasp, and so forth, he did not characterize his condition in this manner when seeking medical treatment in October 2010. See Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting later allegations of back pain when no complaints made about such pain while receiving other treatment).

Further evidence supporting the ALJ's adverse credibility determination is that, when plaintiff was asked why he stopped

working, he replied that he did so to take care of his wife and grandson, explaining that his wife had been in and out of the hospital and he could not keep a steady job with her problems. (Tr. 355). At another point in the administrative hearing, plaintiff testified that he last worked in 2005 as a handyman but worked only one day because the office was too far away. (Tr. 352). Cessation of work for reasons unrelated to a medical condition militate against a finding of disability. See Kelley, 372 F.3d at 961 (citing Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992)).

Plaintiff also gave inconsistent testimony regarding sitting. During the administrative hearing, plaintiff testified that he rose in the morning at six o'clock and, when asked what he did during the morning, plaintiff replied "I sit and watch TV mainly." (Tr. 355). In a Function Report dated February 19, 2010, in response to the question "[d]escribe what you do from the time you wake up until going to bed" plaintiff wrote "sit and watch TV or read." (Tr. 206). However, plaintiff also testified that he had significant problems sitting, and had to move constantly. (Tr. 368, 371-72). While not dispositive, plaintiff's inconsistent statements detract from his credibility. See Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001).

A review of the ALJ's credibility determination shows that, in a manner consistent with and required by Polaski, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies

detracting from plaintiff's credibility. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. <u>Battles</u>, 902 F.2d at 660. Because the ALJ considered the <u>Polaski</u> factors and gave multiple valid reasons for discrediting plaintiff's subjective complaints, this Court is bound by his adverse credibility determination. <u>Hogan</u>, 239 F.3d at 962.

B.   <u>RFC Assessment</u>

Plaintiff next challenges the ALJ's RFC determination, arguing that it is unsupported by some medical evidence, that the ALJ improperly weighed Dr. DeCastro's opinion, and failed to point to medical evidence that plaintiff could stand for six out of eight hours daily despite a finding of peripheral neuropathy. Review of the ALJ's decision reveals no error.

Residual functional capacity is defined as that which a person remains able to do despite his limitations. 20 C.F.R. §§ 404.1545, 416.945, <u>Lauer v. Apfel</u>, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. 20 C.F.R. § 404.1545; <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995); <u>Goff</u>, 421 F.3d at 793.

A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. <u>Id.</u>; <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711-12 (8th Cir. 2001); <u>Lauer</u>,

245 F.3d at 703-04; <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000). Although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. <u>Pearsall</u>, 274 F.3d at 1217 (8th Cir. 2001); <u>McKinney</u>, 228 F.3d at 863.

While an that an ALJ's RFC determination must be supported by some medical evidence, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." <u>Vossen v. Astrue</u>, 612 F.3d 1011, 1016 (8th Cir. 2010). Plaintiff cannot meet this burden on his statements alone. There must be medical signs and laboratory findings showing an impairment which could reasonably be expected to produce the symptoms alleged and which, when considered with all of the other evidence, would lead to the conclusion that the claimant is disabled. 20 C.F.R. §§ 404.1529, 416.929.

As discussed above, the medical signs and laboratory findings from the minimal treatment plaintiff did receive mainly document normal examination findings. In addition, the ALJ noted that examination consistently failed to reveal most of the signs associated with musculoskeletal pain of the chronic and severe nature that plaintiff described caused his debilitating functional limitations. There was no muscle atrophy, persistent or frequently occurring muscle spasm, obvious or consistently reproducible neurological deficits such as motor, sensory or reflex loss or other signs of impingement, or persistent inflammatory signs. The

ALJ noted that the medical evidence established no inability to ambulate effectively or perform fine or gross movements.

Noting that the ALJ determined that plaintiff had peripheral neuropathy, plaintiff complains that the ALJ pointed to no evidence establishing that someone with peripheral neuropathy could stand for six out of eight hours. However, the ALJ was not required to point to evidence and affirmatively prove this. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863 (an ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance). The mere fact of the ALJ's determination that plaintiff had peripheral neuropathy is insufficient to establish disability, absent evidence to establish functional loss resulting from that diagnosis. Trenary, 898 F.2d at 1364. With the exception of plaintiff's testimony, there is no such evidence here. A claimant's statements alone will not establish disability. 20 C.F.R. §§ 404.1529, 416.929.

Plaintiff also contends that the ALJ improperly weighed the opinion of Dr. DeCastro, who plaintiff characterizes as a treating physician. First, calling Dr. DeCastro a treating physician totally mischaracterizes his role. Dr. DeCastro saw plaintiff on one occasion for the sole purpose of evaluating him to determine his eligibility for public aid in the state of Missouri. As a consulting physician, Dr. DeCastro's opinion does not constitute substantial evidence. Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004) (generally when consulting physician

examines claimant only once, his opinion is not substantial evidence). Second, Dr. DeCastro's opinion is not helpful to plaintiff in the social security context. As the ALJ noted, Dr. DeCastro opined that plaintiff's impairments would last for three to four months, which is insufficient to meet the Commissioner's definition of disability. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (defining disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.") Third, the ALJ correctly observed that he was not bound by Dr. DeCastro's opinion that plaintiff met the requirements for disability in Missouri. 20 C.F.R. §§ 404.1504, 416.904 (decisions by other governmental agencies are made based on their rules and are not binding upon the Commissioner, which must make a disability determination based upon social security law; therefore, determinations of other agencies that a claimant is disabled are not binding upon the Commissioner).

Plaintiff also complains that, in a footnote, the ALJ included his unsupported opinion that Missouri's disability determinations process was lenient. However, the ALJ fully explained this statement by noting that such opinions are typically rendered on the basis of subjective allegations, without the benefit of a comprehensive medical examination or updated medical records. This is an accurate characterization of Dr. DeCastro's report. As noted in the above summary of the medical information,

while Dr. DeCastro's "History and Physical" form contains a space to record musculoskeletal and neurological findings upon examination, Dr. DeCastro left the space blank. (Tr. 262). While Dr. DeCastro later noted that plaintiff had no shortness of breath, skin discoloration, or swelling, (Tr. 265), he did not indicate what testing supported his opinion. There is no merit to plaintiff's suggestion that the ALJ erred in his treatment of Dr. DeCastro's opinion.

Plaintiff also appears to suggest that the ALJ did not properly explain his rationale for the weight given Dr. London's opinion. In his decision, however, the ALJ fully discussed Dr. London's examination findings, and wrote that he considered Dr. London's diagnosis of a rotator cuff tear of the left shoulder "purely speculative." (Tr. 18). This is supported by the record. As the ALJ noted, there is no such diagnosis from any other medical provider who examined plaintiff before or after Dr. London performed his consultative evaluation. In fact, radiography of plaintiff's left shoulder, performed in September of 2009 after plaintiff's fall from a roof, revealed normal findings, and there is nothing to indicate that plaintiff had an intervening accident or exacerbation. In addition, Dr. London did not perform any radiological or other objective diagnostic testing to confirm a diagnosis of a torn rotator cuff, nor did he indicate in his report that such diagnosis was based on any particular medical findings. See Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (affirming ALJ's assessment of treating physician's opinion as

unsupported by objective medical tests or diagnostic data and not conclusive in disability determination; the weight given to even a treating physician's opinion is limited if it is only a conclusory statement); see also Plummer v. Apfel, 186 F.3d 422, 430 (3rd Cir. 1999) (citing Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991) (an unsupported diagnosis is not entitled to significant weight)). Absent evidence establishing functional loss, a diagnosis is insufficient to prove disability. Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990). The ALJ also noted the absence of other objective findings in Dr. London's report, including normal grip strength and digital dexterity. The ALJ's decision contains an exhaustive discussion of all of the medical information of record, and the ALJ fully explained his reasons for the weight given to the opinion evidence of record.

While plaintiff is correct that an ALJ's RFC determination must be supported by some medical evidence, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Vossen, 612 F.3d at 1016. Plaintiff herein cannot demonstrate that his functional limitations are greater than those described in the ALJ's RFC assessment. An RFC assessment draws from medical sources for support, but RFC is ultimately an administrative decision reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citations omitted). Plaintiff herein cannot demonstrate that his functional limitations are greater than those described in the ALJ's RFC assessment. The ALJ's RFC determination is also supported by his

legally sufficient determination that plaintiff's subjective allegations were less than fully credible.

Review of the ALJ's RFC determination reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole. Having reviewed the ALJ's decision with the requisite deference, the undersigned concludes that it is supported by substantial evidence on the record as a whole.

C.   Vocational Expert Testimony

Plaintiff next contends that the ALJ erred in relying upon the vocational expert's testimony because it did not account for all of his limitations. The undersigned disagrees.

"A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001) (citing Prosch v. Apfel, 201 F.3d 1010, 1015 (8th Cir. 2000)). An ALJ may omit alleged impairments from a hypothetical question when there is no medical evidence that such impairments impose any restrictions on the claimant's functional capabilities. Haynes v. Shalala, 26 F.3d 812, 815 (8th Cir. 1994).

As explained, supra, substantial evidence supports the ALJ's RFC and credibility determinations, the ALJ properly considered and weighed all of the evidence of record. Likewise, the hypothetical questions he posed to the VE included all the impairments he found to be credible. See Strongson v. Barnhart,

361 F.3d 1066, 1072-73 (8th Cir. 2004)(VE's testimony constituted substantial evidence when ALJ based his hypothetical upon a legally sufficient RFC and credibility determination.)  It was permissible for the ALJ to exclude "any alleged impairments that [he] has properly rejected as untrue or unsubstantiated," including less than occasional reaching.  Hunt, 250 F.3d at 625 (citing Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997)).

For all of the foregoing reasons, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole, and should therefore be affirmed.  Because there is substantial evidence to support the decision, reversal is not required merely because substantial evidence may support a different outcome, or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir.2001); Browning, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of August, 2013.